UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|                    |                          |
|--------------------|--------------------------|
| UNITED STATES      |                          |
| v.                 | No. 3:18-cr-00081 (SRU)  |
| CARLOS OVALLE      |                          |

## RULING ON MOTION TO SUPPRESS

Carlos Ovalle is charged in a Superseding Indictment with Conspiracy to Distribute and to Possess with Intent to Distribute One Kilogram or More of Heroin and Five Kilograms or More of Cocaine in violation of 21 U.S.C. §§ 841(a)(1), § 841(b)(1)(A)(i) and (ii), and § 846. *See* Doc. No. 179 at 1–2. Ovalle now moves to suppress evidence obtained at his residence during the execution of an arrest warrant. *See* Def's Mot. to Suppress (Doc. No. 714). Specifically, he contends that on April 25, 2018, law enforcement officers conducted an unauthorized search of his apartment and illegally discovered evidence later used to obtain a search warrant. *See* Mem. in Supp. Def's Mot. to Suppress (Def's Mot.) (Doc. No. 714-1) at 5–9. The government opposes Ovalle's motion, arguing that the evidence in question was observed in plain view after officers conducted a lawful security sweep of the apartment during Ovalle's arrest. *See* Gov't Opp. (Doc. No. 733) at 3–4. On October 17, 2019, I held an evidentiary hearing and took Ovalle's motion under advisement. *See* Doc. No. 859.

For the reasons that follow, Ovalle's motion is **denied**.

## I.  Findings of Fact

The factual summary below was provided by Drug Enforcement Administration ("DEA") Task Force Officer Jonathan Troesser ("Officer Troesser"), who testified at the evidentiary hearing. *See* Doc. No. 860.

In April 2018, federal agents were surveilling Ovalle in connection with an ongoing investigation of suspected heroin and cocaine distribution. *See* Hearing Transcript ("Tr.") at 15. On April 25, 2018, around 6:00 a.m., federal officers arrived at Ovalle's residence, located at 8A Poplar Lane in Mansfield, Connecticut, to execute a warrant for his arrest. Tr. at 19, 21. Upon their arrival, Officer Troesser testified that officers knocked on the door, announced their presence, and rang the doorbell. Tr. at 21–22. After waiting about forty-five seconds and receiving no response, officers decided to make a forced entry into the residence using a ram. *Id*.

Officer Troesser described the residence as "a very small, tight quartered apartment." Tr. at 23. He testified that from the entry door he could see the living room, the kitchen, and a doorway leading to the bathroom. Tr. at 24. Once inside, officers found a resident in the doorway adjacent to the bathroom. *Id*. Officers were initially unable to determine the identity of the resident, but he was later identified as Ovalle. Tr. at 24, 36.

Officers instructed Ovalle to show his hands and lie on the ground in the hallway next to the bathroom so he could be handcuffed. Tr. at 26–27. As another officer handcuffed Ovalle, Officer Troesser stepped over him and glanced into the open bathroom door. Tr. at 27. Officer Troesser "looked into the bathroom, and [] could see there was like a dark colored mat in front of the toilet, and it had a white powder on the mat, [and] on the toilet seat."[1] *Id*. After securing Ovalle, agents walked him to the bedroom so he could select clothing for his court appearance. Tr. at 29. Officers sat Ovalle on the bed and read him his *Miranda* rights. *Id.*

While in the bedroom, Officer Troesser noticed atop the dresser "a small clear, knotted plastic baggie that had a couple [of] what appeared to be pills inside." Tr. at 31. Officer Troesser also noticed "a small [] wad of cash sitting next to the pills." Tr. at 32. Officers

---

[1] One of the officers conducted a field test of the white powdery substance discovered in the bathroom, which yielded a positive result for the presumptive presence of cocaine. *See* Gov't Opp. at 2; Tr. at 33.

2

notified Ovalle of the items they discovered in the apartment before he was transported to New Haven. Tr. at 33. Based on the items observed during the arrest, officers applied for a warrant to search the premises, which was granted and subsequently executed later that day. Tr. at 34.

## II. Conclusions of Law

### A. Motion to Suppress Evidence

"[T]he burden of production and persuasion generally rest upon the movant in a suppression hearing." *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980) (collecting cases). "In a motion to suppress physical evidence, the burden of proof is initially on the defendant. Once the defendant has established some factual basis for the motion, the burden shifts to the government to show that the search was lawful." *United States v. O'Neill*, 2016 WL 6802644, at *8 (W.D.N.Y. Nov. 17, 2016) (citation omitted). "The standard of proof on the party who carries the burden is preponderance of the evidence." *Id*.

1. *Was the Initial Sweep of Ovalle's Residence Lawful?*

In his motion, Ovalle argues that the items spotted by arresting officers were discovered when officers engaged in a "protective sweep" of Ovalle's apartment, without any reason to believe that another individual was hiding inside. Def's Mot. at 8. "[Officers] illegally entered and searched the bathroom, even subjecting some powder around the toilet to a field test and searched the top of a cluttered dresser for the presence of a third person when there were no articulable facts to believe someone else was hiding in the apartment presenting a danger of harm." *Id*. at 8–9. Ovalle argues that the protective sweep conducted during his arrest did not adhere to the limitations placed on officers by the Supreme Court and the Second Circuit. *See id*. at 6–7.

3

In *Maryland v. Buie*, the Supreme Court held that during an arrest "officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." 494 U.S. 325, 335 (1990). Such searches "may extend only to a cursory inspection of those spaces where a person may be found." *Id.* at 326 (footnote omitted).

Ovalle also cites *United States v. Moran Vargas*, 376 F.3d 112, 113 (2d Cir. 2004), where the Second Circuit applied the *Buie* analysis after police found heroin during a warrantless search of a motel room. In *Moran Vargas*, federal agents were interviewing the defendant in his motel room when they noticed that the bathroom door was ajar. *See id.* The defendant quickly shut the bathroom door, telling the agents that they could not use his bathroom. *Id.* In response, another agent opened the bathroom door and discovered feces containing heroin pellets in the bathtub. *Id.* The defendant was subsequently arrested for heroin possession. *Id.*

After the defendant moved to suppress the evidence discovered in the bathroom, the government argued that the agents' conduct constituted a permissible "protective sweep" under *Buie*. *Id.* at 115–16. The Second Circuit disagreed, noting that there were no specific facts to support a finding that agents believed "(1) that anyone other than [the defendant] was present inside the motel room, or (2) that anyone so concealed posed a danger to their safety." *Id.* at 116.

Similarly, Ovalle argues that there are no facts presented here that indicate that anyone other than Ovalle would be residing in his apartment. *See* Def's Mot. at 8. "[T]he arrest pursuant to the warrant occurred at 6:05 a.m. and the police had no search warrant or probable cause to believe there were drugs, weapons, or other people hiding within the apartment." *Id.* Ovalle contends that if officers had probable cause to search the apartment before his arrest, they

4

would have obtained a search warrant before arriving to 8A Poplar Lane. *See id.* at 9. Therefore, Ovalle contends that the search warrant later issued and executed was based off "what officers had seen earlier during their illegal search, which did not meet the requirements of a protective sweep." *Id.*

In response, the government raises two primary arguments: (1) any alleged protective sweep[2] conducted by officers was not a Fourth Amendment violation, and (2) the items of contraband were observed in plain view. *See* Gov't Opp. at 3, 7.

First, the government argues that the alleged protective sweep of Ovalle's apartment during his arrest would have been lawful under *Buie*. As discussed above, the *Buie* Court held that officers may look in areas "immediately adjoining the place of arrest" without probable cause or reasonable suspicion. *Buie*, 494 U.S. at 334. The Court reasoned that "an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.' An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." *Id.* at 333.

Here, the government contends that at the time of Ovalle's arrest, officers knew that he had been indicted on federal narcotics charges and that he "posed a possible threat of violence" due to a prior manslaughter conviction. Gov't Opp. at 8. In addition, the government notes that "[t]here is nothing in the record to suggest that locations in the apartment which could not hide [Ovalle's] confederates . . . such as drawers, cabinets, boxes, clothing and the like, were disturbed" by arresting officers. *Id*.

Secondly, the government argues that the white powder found around the toilet, and the plastic bags of pills and the currency sitting on the dresser were observed by officers in plain

---

[2] There was no testimony that the officers conducted a protective sweep. Instead, the record evidence was that the cocaine in the bathroom was observed while handcuffing Ovalle, who was later taken to his bedroom to obtain clothing.

view. *Id.* at 3. "[Ovalle] was arrested just outside the bathroom, so the white powder . . . was also visible from where [Special Agent] Castiglione arrested [him]. The pills and currency, however, were not noticed until [Special Agent] Castiglione took [Ovalle] into the bedroom to read him his rights." *Id.* at 4–5. Once officers entered the bedroom, they observed the pills and currency in plain view on the dresser. *Id.*

After reviewing the evidence in the record, I conclude that the officers' activities in Ovalle's apartment were lawful. Officer Troesser testified that Ovalle was arrested right in front of the bathroom door. Tr. at 29, 37. When Ovalle was initially detained, officers were unable to make a positive identification. Tr. at 24. When officers entered the apartment, it was not clear whether they had in fact located Ovalle, or whether another individual may be hiding in the apartment. Accordingly, officers did not need probable cause or reasonable suspicion to glance into the open bathroom door, which "immediately adjoin[ed] the place of arrest." *Buie*, 494 U.S. at 334. To the extent that Ovalle argues that the officers' field test of the white powder was unlawful, arresting officers did not know whether the powder was fentanyl or some other potentially toxic chemical when they arrived. Therefore, it was permissible for officers to conduct the field test without a search warrant for their own protection.

Moreover, the facts presented here are distinguishable from *Moran Vargas*. In that case, officers arrived at the defendant's motel room without an arrest warrant and opened the bathroom door that the defendant closed in their presence. *See* 376 F.3d. at 113–14. Here, agents were executing a valid warrant for Ovalle's arrest and observed the white powder from the hallway through the open bathroom door. *See* Arrest Warrant (Doc. No. 714-4) at 1; Tr. at 26–27. That open bathroom door was immediately adjacent to where Ovalle was arrested. *See* Photo of Bathroom Door, Gov.t Ex. A at 5.

6

Based on the totality of circumstances, the officers' limited search of Ovalle's residence was lawful.

2.  *Should the Evidence be Suppressed?*

I also conclude that the white powder found around the toilet and the bag of pills and currency discovered in the bedroom were observed in plain view. A police officer may seize items "in plain view if: (1) the officer's initial intrusion was permissible under the Fourth Amendment []; (2) the discovery of evidence is inadvertent; and (3) the nature of the evidence found is immediately apparent." *United States v. Graham*, 119 F. Supp. 2d 116, 126 (D. Conn. 2000) (quoting *United States v. Scopo*, 19 F.3d 777, 782 (2d Cir. 1994), *cert. denied*, 513 U.S. 877 (1994) (internal quotation marks omitted)).

Officers initially entered Ovalle's apartment to execute an arrest warrant. In addition, there is no evidence to suggest that when officers entered the apartment, they intended to discover the items in question. The powder was discovered right below the toilet and the pills and currency were found on top of the dresser; both were in plain view from a legitimate vantage point.

Finally, Officer Troesser testified that the nature of the powder, pills, and currency was immediately apparent. *See* Tr. at 27 ("From where I was standing right by his feet, I looked into the bathroom, and you could see there was like a dark colored mat in front of the toilet, and it had a white powder on the mat, on the toilet seat . . . . [I]t appeared as though he may have been trying to dispose of evidence down the toilet.); Tr. at 31–32 ("During the period that we were talking with Ovalle, I did notice on the dresser, directly to my left, a small, clear, knotted plastic baggie that had a couple what appeared to be pills inside [and] there was a small like wad of cash sitting next to the pills.").

Because the initial entry into the apartment was justified by an arrest warrant, any protective sweep did not violate the Fourth Amendment, and officers discovered evidence in plain view, I conclude the search warrant was based on information legally obtained during Ovalle's arrest.  Therefore, I deny Ovalle's motion to suppress evidence seized from 8A Poplar Lane at the time of his arrest, as well as evidence obtained through the subsequent search warrant.

### III. Conclusion

For the foregoing reasons, Ovalle's motion to suppress evidence (doc. no. 714) is **denied**.

So ordered.

Dated at Bridgeport, Connecticut, this 22nd day of November 2019.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge